**THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **HILTON FARLOUGH and FAITH FARLOUGH** | * | **CIVIL ACTION NO.:** |
| **Plaintiffs** | * | **SECTION:** |
| **versus** | * | **JUDGE:** |
| **UNITED STATES OF AMERICA** | * | **MAGISTRATE:** |
| **Defendant** | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TO THE HONORABLE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA AND THE JUDGES THEREOF:

**COMPLAINT**

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Hilton Farlough and Faith Farlough, who respectfully allege the following:

**I. PARTIES**

1. Made Plaintiffs herein are:
   a. HILTON FARLOUGH, a person of the full age of majority, who is domiciled in the Parish of St. John the Baptist, State of Louisiana; and
   b. FAITH FARLOUGH, a person of the full age of majority, who is the wife of Hilton Farlough and who is domiciled in the Parish of St. John the Baptist, State of Louisiana.

2. Made Defendant herein is the United States of America.

## II. JURISDICTION AND VENUE

3. The Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(b), as this lawsuit arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq* and involves a case in which the United States is a party-defendant. The Court has jurisdiction over any and all Louisiana state law claims asserted herein pursuant to 28 U.S.C. § 1367, as said state law claims form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), for a substantial part of the events giving rise to this claim took place in New Orleans, Louisiana.

## III. FACTS

5. At all times pertinent herein, Defendant, the United States of America, operated a healthcare facility known as the Southeast Louisiana Veterans Healthcare Services ["SE Louisiana Veterans HCS"]. Defendant, in operating this medical center, obligated itself to veterans, including Plaintiff, Hilton Farlough, to use that degree of care, skill, diligence, and attention used by similarly situated hospitals in the care and treatment of patients.

6. Upon information and belief, the SE Louisiana Veterans HCS operated by Defendant has, in its employ, doctors, nurses, interns, residents, student nurses, nurses' aides, and/or other hospital personnel over which it exercises control and supervision, retaining the right to employ and to discharge such employees.

7. Dr. Akhil Parulkar is a healthcare provider, who, at all times pertinent herein, was an employee of the Defendant at SE Louisiana Veterans HCS and was acting within the

course and scope of his employment with Defendant when he treated the Plaintiff, Hilton Farlough.

8. On January 6, 2015, seventy-five-year-old Hilton Farlough presented to the Emergency Department of Tulane Medical Center ("Tulane") from SE Louisiana Veterans HCS due to a 1½-month history of worsening lower extremity weakness.

9. In the Tulane Emergency Department, Dr. Marcus Clayton found Mr. Farlough to have 2/5 strength in his bilateral lower extremities and hypoactive patellar reflexes. Dr. Clayton's differential diagnoses included transverse myelitis, amyotrophic lateral sclerosis, peripheral nerve dysfunction, or spinal cord lesion. Mr. Farlough was admitted to the hospital for further work-up by the internal medicine and neurology services.

10. After his admit on January 6, 2015, Mr. Farlough was evaluated by a neurology resident, Dr. Jacob Stein, who documented decreased sensation in both of Mr. Farlough's lower legs that extended up to the mid-calf level. Dr. Stein also noted that muscle wasting was present in the lower extremities and intrinsic muscles of the hands. Suspecting a neuromuscular or myositis diagnosis, Dr. Stein recommended that Mr. Farlough undergo an MRI of the brain without contrast and also an MRI of the **complete** spine. Depending on the results of those tests, an EMG and muscle biopsy would possibly be needed as well.

11. Dr. Stein's attending neurologist, Dr. Kristina Lafaye, opined that Mr. Farlough's symptoms of hyporeflexia, stocking/glove sensory loss, asymmetric muscle atrophy, and lack of pain pointed to a diagnosis of chronic demyelinating polyneuropathy ("CIDP"). She recommended a lumbar puncture with EMG/NCS and checking an IgA level—since, in her opinion, Mr. Farlough would likely need IVIG therapy.

12. Prior to the onset of his lower extremity weakness, Mr. Farlough was ambulating independently. On January 7, 2015, he was evaluated for physical therapy services due to his increased risk for falls. Inpatient physical therapy and rehabilitation were recommended in order to address Mr. Farlough's impairments in mobility, strength, balance, and coordination.

13. A nerve conduction study was performed on January 8, 2015. Dr. Stein (neurology resident) reported that Mr. Farlough's preliminary nerve conduction study, which showed significant delays in conduction, was suggestive of CIPD. A 5-day course of IVIG (400 mg/kg/day) and oral B12 replacement were recommended. Dr. Lafaye (neurology attending) concurred with Dr. Stein's diagnosis and treatment plan; she speculated that the preservation of Mr. Farlough's reflexes could partially be explained by his B12 deficiency.

14. On January 9, 2015, Dr. Lafaye noted that Mr. Farlough's reflexes were brisker than expected, which prompted her to request iron studies, a blood smear, and intrinsic factor antibodies. Mr. Farlough complained of constipation on January 10th. Dr. Sabre Patton-Fee (neurology resident) considered this to be related to CIDP (the presumptive diagnosis), and a stool softener was prescribed.

15. On January 11, 2015, Mr. Farlough subjectively reported that he was feeling better--even though his neurological exam remained unchanged. Dr. Michelle Guidry (internal medicine attending) opined that Mr. Farlough's hyperreflexia was **inconsistent with a diagnosis of CIDP**, and that she would discuss the need for additional spinal imaging with the neurology team.

16. An MRI of the **lumbar** spine (not the complete spine) without contrast was obtained on

the morning of January 12, 2015. Marked discogenic disease of the lumbar spine, most prominent at L4-L5, with spinal canal stenosis from large posterior disc osteophyte complexes was identified. Mild to moderate narrowing of the right L3-L4 neural foramina was suggestive of existing nerve root compression. Neither Dr. Enrique Palacios nor Dr. Laveil Allen (resident), the interpreting radiologists, mentioned the presence of spinal cord compression or ligamentum flavum thickening in this initial report.

17. Mr. Farlough completed his 5-day course of IVIG therapy on January 12, 2015, and transfer to inpatient rehabilitation was expected. Unfortunately, on January 14th, Humana denied a request for inpatient rehabilitation services.

18. On January 17, 2015, Mr. Farlough was said to be slowly improving, although he continued to be significantly impaired. He could stand unassisted, but his gait was still unstable, and his posture and coordination were poor. Inpatient rehabilitation placement was denied by Humana again on January 21st, despite a peer-to-peer conference. Accordingly, Mr. Farlough remained hospitalized awaiting placement into a skilled nursing facility.

19. On the afternoon of January 23, 2015, Mr. Farlough's systolic blood pressure dropped into the 80's, and he was unable to recall the current year or identify the current President of the United States. That evening, he spiked a fever of 102.4°, and his heart rate increased into the 130's. Blood and urine cultures were obtained, and Mr. Farlough was empirically started on vancomycin and Zosyn.

20. On January 24, 2015, blood cultures resulted positive for *Klebsiella pneumonia.* Meropenem was added to Mr. Farlough's antibiotic regime due to persistent fevers. On

January 26th, Mr. Farlough exhibited decreased flexion in his bilateral thighs that was thought to be secondary to his bacteremia. Dr. Cameron Long (internal medicine resident) recommended that Mr. Farlough undergo a CT scan of the abdomen in order to evaluate for an intra-abdominal abscess, for the source of infection remained a mystery. Dr. Akhil Parulkar (internal medicine attending of SE Louisiana Veterans HCS) cosigned Dr. Long's progress note, but he made no notation of his own.

21. A CT scan of the abdomen/pelvis with IV contrast was performed on January 26, 2015. Paravertebral soft tissue stranding was seen at the T9-L1 vertebral levels. Radiologists recommended an MRI to further characterize this finding, since inflammatory/infectious etiologies still could not be excluded.

22. On January 27, 2015, Dr. Cameron Long (internal medicine resident) mentioned that an MRI was needed to further evaluate the paravertebral soft tissue stranding seen on Mr. Farlough's contrasted CT of the abdomen. Defendant's attending physician, Dr. Akhil Parulkar, signed Dr. Long's progress note, but he offered no additional comments or recommendations regarding the abdominal CT scan findings or the need for an MRI.

23. Between January 27th and January 28th of 2015, Mr. Farlough's worsening weakness and decreased sensation in his lower legs rendered him unable to stand. Suspecting a sepsis-induced relapse of CIDP, Dr. Long re-consulted the neurology team, and a second course of IVIG was recommended.

24. By January 29, 2015, Mr. Farlough required maximum assistance for all functional mobility activities during his physical therapy session. Without any additional diagnostic testing, Dr. Joseph Tarsia (neurology resident) and Dr. Angela Traylor (attending) attributed Mr. Farlough's declining lower extremity strength to a CIDP exacerbation.

25. According to a progress note signed only by Dr. Akhil Parulkar (internal medicine attending of Defendant) on January 29, 2015, a high index of suspicion for "abscess/osteo" was to be maintained given Mr. Farlough's abdominal CT scan findings and worsening neurological status. In addition, blood cultures remained positive for *Klebsiella pneumonia*, despite the administration of meropenem. Nevertheless, Dr. Parulkar's plan only included continuing IVIG, oral B12 replacement, and aggressive PT/OT. He still made no mention of the need to obtain an MRI.

26. By January 30, 2015, Mr. Farlough was unable to move his bilateral lower extremities at all, but his reflexes remained intact. Sensation to sharp was decreased on the bottoms of both of his feet. Dr. Joseph Tarsia (neurology resident) acknowledged that Mr. Farlough was experiencing worsening motor function with sensory progression while receiving IVIG. He and Dr. Angel Traylor opined that a true response to IVIG could take days or weeks and that symptom improvement could be delayed.

27. Mr. Farlough's strength remained 0/5 in his lower extremities on February 1, 2015, and he now reported decreased sensation on his right side up to the mid-thigh. Moreover, he was experiencing bladder and bowel incontinence.

28. By February 2, 2015, Mr. Farlough had not yet regained any function in his lower extremities. Dr. Traylor noted that the second IVIG infusion had yielded minimal results. She deferred to the input of Dr. Moris Danon of the SE Louisiana Veterans HCS, following Mr. Farlough's appointment with him on February 4th.

29. On February 4, 2015, Mr. Farlough was transported to the SE Louisiana Veterans HCS *via* ambulance for his appointment with neurologist Dr. Moris Danon. After reviewing the lumbar MRI and nerve conduction studies performed at Tulane, Dr. Danon's

differential diagnoses included transverse myelitis, CIDP, and thoracic spine tumor/infection. He recommended that Mr. Farlough undergo an MRI of the thoracic spine as well as a lumbar puncture; however, per Dr. Sabre Patton-Fee's (neurology resident) February 4th progress note, the previous neurology team (*i.e.* Dr. Stein and Dr. Lafaye) had not felt as though a lumbar puncture was necessary to aid in the diagnosis of CIDP.

30. An MRI of the thoracic spine with and without contrast was obtained on the evening of February 4, 2015. It revealed narrowing of the T10-T11 disc space with edema of the disc spreading into the adjacent vertebral bodies. Epidural enhancement was identified from T8-T11; compression of the cord at this level with myelopathy was also present. These findings were concerning for osteodiscitis with paravertebral and epidural inflammatory changes. Dr. Kyle J. Degeyter (resident) and Dr. Jeremy Nguyen reported that the MRI findings at T10-T11 corresponded to the paravertebral inflammation seen on the CT of the abdomen/pelvis performed on January 26th at Tulane.

31. Mr. Farlough was evaluated by the neurosurgery service on February 5, 2015. Dr. Blake Raggio (neurosurgery resident) noted that Mr. Farlough had a 10-day history of urinary incontinence, sensory deficits, and bilateral lower extremity paralysis. Mr. Farlough's lower extremity strength remained 0/5 with complete loss of sensation below the L3 level and decreased sensation below L12. Dr. Raggio and Dr. Manish Singh (neurosurgery attending) recommended surgical decompression and possible thoracic spinal fusion. Dr. Singh informed Mr. Farlough that his chance of recovery following surgery was very minimal because symptoms had been present for over two weeks. Nevertheless, surgery was Mr. Farlough's best and only chance for recovery.

32. On February 5, 2015, infectious disease specialists Dr. Yussef Bennani (fellow) and Dr. Nicholas Van Sickels (attending) recommended discontinuing oral Cipro and starting ceftriaxone two grams daily *via* IVPB and vancomycin one gram twice per day *via* IVPB to treat Mr. Farlough's epidural abscess. They also agreed that surgery was a necessary part of treatment.

33. On February 6, 2015,Mr. Farlough underwent a laminectomy, discectomy, washout, and fusion performed by Dr. Manish Singh. Bone for grafting was taken from Mr. Farlough's right iliac crest. Postoperative diagnoses included T10-T11 osteomyelitis, diskitis with epidural abscess with severe cord compression with cord signal intensity changes with paravertebral abscess.

34. The initial report of the MRI of the lumbar spine with and without contrast performed on January 12, 2015 was amended by Dr. Laveil Allen (resident) on February 6, 2015. Her addendum stated that retrospective review of the January 12th MRI of the lumbar spine revealed **severe spinal stenosis at the T10-T11 level in the setting of large posterior disc osteophyte complex and ligamentum flavum thickening.**

35. On February 9, 2015, cultures of the epidural abscess remained negative, prompting Dr. Bennani and Dr. Van Sickels to speculate that the pathogen was likely Klebsiella as opposed to Staphylococcus. Vancomycin was discontinued; however, Mr. Farlough was expected to remain on an extended course of ceftriaxone.

36. An amended report of the aerobic epidural abscess culture was released on February 10, 2015, and it confirmed methicillin-susceptible *Staphylococcus areaus* in only the liquid media. Vancomycin was re-initiated at an increased dose of 1.5 grams *via* IVPB every twelve hours. Per the February 10th neurosurgery progress note, Mr. Farlough was able to

wiggle his right big toe, but his lower extremity motor strength was otherwise 0/5.

37. On February 11, 2015, Mr. Farlough's lower extremities remained flaccid with minimal movement and decreased range of motion; his lower extremity muscle strength was graded as 1/5. He continued to require stool softeners and a Foley catheter. Cefazolin and rifampin were initiated following the discontinuation of vancomycin and ceftriaxone.

38. Mr. Farlough was discharged to Touro Infirmary on February 12, 2015 to continue his recovery and rehabilitation. His lower extremity strength was 1-2/5 at this time, and he only had some sensation of pain/pressure in patchy distributions.

39. Upon Mr. Farlough's arrival to Touro Infirmary on February 12, 2015, his problem list included a T12 ASIA C spinal cord injury with thoracic osteomyelitis and phlegmon status post decompression and fusion, neurogenic bowel and bladder, hypomagnesemia, hypokalemia, hypertension, and glaucoma. Following the removal of his staples on February 20th, Mr. Farlough's right gluteal incision, where the bone graft had been harvested, was noted to be opened and oozing serous drainage on February 23rd.

40. On February 26, 2015, Dr. Eduard Danilyants was consulted to evaluate the wound after it began draining seropurulent discharge. Dr. Manish Singh was notified, and he requested that Mr. Farlough be transferred back to Tulane to undergo drainage and debridement of his right gluteal wound.

41. Mr. Farlough was transferred back to Tulane on February 26, 2015, and on February 27, 2015, Dr. Singh performed an incision, drainage and washout. Wound cultures were positive for vancomycin-resistant *Enterococcus faecium*. Daptomycin was added to Mr. Farlough's existing antibiotic regime of cefazolin and rifampin.

42. On March 10, 2015, Mr. Farlough returned to Touro Infirmary, where he remained on

intravenous antibiotics until April 25, 2015. On April 28, Mr. Farlough completed his inpatient rehabilitation stint, but physical and occupational therapy would continue *via* home health for an additional six weeks. At the time of discharge, Mr. Farlough required moderate to maximum assistance with standing, transfers, lower body dressing, and bathing. He also continued to use a wheelchair, bedside commode, and tub bench. His restrictions and limitations remain largely unchanged, despite therapeutic efforts.

43. CIDP is a rare condition, and Mr. Farlough's signs and symptoms did not fit the diagnosis, such that his healthcare providers' failure to conduct a full differential diagnosis, in light of Mr. Farlough's signs and symptoms, constitutes a clear and obvious breach of the standard of care.

44. Mr. Farlough's condition was acute in nature, and he reported no antecedent respiratory or gastrointestinal infection; most notably, Mr. Farlough exhibited hyperreflexia, rather than hyporeflexia, and yet, his treating physicians remained committed to the CIDP diagnosis, despite objective evidence to the contrary. On January 8, 2015, Dr. Lafaye justified Mr. Farlough's hyperreflexia as being partially explained by his B12 deficiency. The following day, Dr. Lafaye wrote that Mr. Farlough's reflexes were brisker than expected. On January 11th, Dr. Michelle Guidry, an internal medicine specialist, commented that Mr. Farlough's hyperreflexia was inconsistent with a diagnosis of CIDP and that she would discuss the need for additional spinal imaging with his neurologists.

45. Mr. Farlough's healthcare providers knew or should have known that the diagnosis of CIDP requires a lumbar puncture for confirmation. In fact, after reviewing the NCS obtained at Tulane on January 8th, the SE Louisiana Veterans HCS neurologist, Dr. Moris Danon, recommended that Mr. Farlough undergo a lumbar puncture and thoracic spine

MR, citing that CIDP clearly could not be definitely diagnosed by the NCS alone.

46. When Mr. Farlough's condition worsened, his healthcare providers characterized it as a CIDP relapse. When Mr. Farlough failed to respond to the second IVIG course, his healthcare providers stated that the treatment would take time. By January 30, 2015, Mr. Farlough was unable to move his lower extremities, and healthcare providers still failed to consider alternative diagnoses.

47. In light of the January 26, 2015 abdominal/pelvic CT scan findings and Mr. Farlough's deteriorating neurological status, a high index of suspicion for abscess/osteo should have been maintained, but Mr. Farlough's healthcare providers failed to even remotely consider the possibility of a spinal abscess.

48. Had Mr. Farlough's healthcare providers considered other etiologies for Mr. Farlough's neurologic symptoms and ordered the appropriate testing needed to rule those diagnoses in or out, his spinal abscess would have been identified and treated much sooner. The physicians' failure to conduct a full differential diagnosis and/or respond to Mr. Farlough's signs and symptoms constitutes a clear breach of the standard of care.

49. In writing to the Farlough family on February 8, 2015 concerning Mr. Farlough's negative outcome, Defendant's employee and attending physician, Dr. Parulkar, stated his "humble apologies for the serious lapse in the correct diagnosis being made in a timely manner and the resulting significant consequences to the patient and also all that the family are enduring."

## IV. MEDICAL MALPRACTICE PURSUANT TO THE FEDERAL TORT CLAIMS ACT

50. Mr. Farlough's healthcare providers at SE Louisiana Veterans HCS, including, but not

limited to, Dr. Parulkar, breached the standard of care, causing Mr. Farlough to suffer severe physical pain and debilitation, and additional medical and hospital care and treatment for his neurological problems and the serious residuals therof. Accordingly, Defendant, the United States of America, is liable to Plaintiffs for medical malpractice under the Federal Tort Claims Act in the amount of twenty million dollars.

51. Defendant's breaches of the standard of care include, but are not limited to, the following:

    a. Failure to conduct a full differential diagnosis;

    b. Failure to timely diagnose and/or treat Mr. Farlough's epidural abscess;

    c. Failure to respond to the patient's signs and symptoms; and/or

    d. Failure to obtain an MRI of the thoracic spine in a timely manner.

52. Plaintiffs, Hilton Farlough and his wife, Faith Farlough, timely filed an administrative claim pursuant to the Federal Tort Claims Act on September 9, 2015, which was acknowledged on September 10, 2015. Damages were claimed in the amount of twenty million dollars.

53. On January 23, 2017, the Department of Veterans Affairs wrote to undersigned counsel advising that "[undersigned's] cooperation in working with [Defendant] is appreciated," but that Defendant was denying the claim as "not amenable to resolution," due to the fact that settlement was not possible at that time. As of January 2017, Mr. Farlough's state medical review panel proceeding was still pending.

## <u>V. DAMAGES</u>

54. As a result of the foregoing, Plaintiff, Hilton Farlough, sustained severe and permanent injuries and damages, which include, but are not limited to, the following:

a. Past physical pain and suffering;

b. Residual and permanent disability and/or impairment;

c. Future physical pain and suffering;

d. Keen mental anguish;

e. Emotional distress;

f. Humiliation and embarrassment as a result of disability;

g. Past medical expenses;

h. Future medical expenses;

i. Nervousness, depression, and/or anxiety; and/or

j. Any and all other damages as are reasonable in the premises.

55. As a result of the foregoing, Plaintiff, Faith Farlough, has sustained loss of love, society, affection, support, and/or consortium.

## VII. PRAYER

**WHEREFORE**, Plaintiffs, Hilton Farlough and Faith Farlough, pray that after due proceedings had, there be judgment rendered in their favor and against Defendant, and that they be awarded damages in the amount of twenty million dollars, with judicial interest from the date of the filing of their administrative claim until paid, plus all costs of these proceedings, and for all general and equitable relief allowable under the law.

Respectfully submitted,

KARA HADICAN SAMUELS & ASSOCIATES, LLC

By: ***/s/ Kara Hadican Samuels***
Kara Hadican Samuels (# 29234) (T.A.)
935 Gravier Street, Suite 1150
New Orleans, Louisiana 70112
Telephone: (504) 558-9478
Facsimile: (504) 558-9482
kara@karasamuels.com

**-AND-**

**LAW OFFICE OF ALVENDIA, KELLY & DEMAREST, LLC**

**Roderick "Rico" Alvendia, Bar No. 25554**
909 Poydras Street, Suite 1625
New Orleans, Louisiana 70112
Telephone: (504) 200-0000
Facsimile: (504) 200-0001

***ATTORNEYS FOR PLAINTIFFS***

**PLEASE SERVE:**

United State of America
Through the Honorable David J. Shulkin
Secretary of the Department of Veterans Affairs
810 Vermont Avenue N.W.
Washington, DC 20420

United States of America
Through U.S. Attorney General Jeff Sessions
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

United States of America
Through the U.S. Attorney for the Eastern District of Louisiana
The Honorable Kenneth A. Polite
210 Hale Boggs Federal Building
500 Poydras Street
New Orleans, LA 70130

United States of America
Through Department of Regional Affairs
c/o Charles Caine
Office of Regional Counsel
1515 Poydras Street, Room 702
New Orleans LA, 70112